OPINION
 

 ANNE GARDNER Justice.
 

 Both Father and Mother challenge the trial court’s termination of their parental rights. Both parents assert ineffective assistance of counsel claims and challenge the sufficiency of the evidence to support termination. Father also claims that the trial court’s termination order is void. We will affirm.
 

 I. PROCEDURAL ISSUES
 

 A. Background
 

 The Texas Department of Protective and Regulatory Services (“TDPRS”) filed its original petition for termination of appellants’ parental rights on June 28, 2002, and that same date the trial court appointed TDPRS temporary managing conservator of appellants’ children. The trial court scheduled a full adversarial hearing for July 11, 2002. On July 10, the trial court reset the adversary hearing for July 30, 2002, and signed an order extending the temporary orders for the pendency of the suit or until further order of the court. There is no other order in the clerk’s record concerning an adversarial hearing.
 

 On April 17, 2003, Father filed a motion for continuance from the trial court’s scheduled May 20, 2003 trial date. On May 1, 2003, Father filed a motion for extension from the trial court’s scheduled June 16, 2003 trial date. There is no order granting either motion, but the case went to trial on July 21, 2003. Following a five-day trial to the jury, the trial court rendered judgment terminating Father’s and Mother’s parental rights on August 18, 2003.
 

 B. Ineffective Assistance of Counsel
 

 1. General Principles
 

 The trial court appointed counsel for both Mother and Father, who were indigent. On appeal, Mother and Father claim for the first time that their court-appointed counsel provided ineffective assistance because counsel did not object to the trial starting after the one-year deadline expired or the court’s failure to conduct a fourteen-day adversarial hearing.
 

 The Texas Supreme Court has held that “the statutory right to counsel in parental-rights termination cases embodies the right to effective counsel.”
 
 In re M.S.,
 
 115 S.W.3d 534, 544 (Tex.2003);
 
 see
 
 Tex. Fam. Cobe Ann. § 107.013(a)(1) (Vernon Supp. 2004-05). Thus, when the trial court decided to appoint counsel to represent appellants, counsel’s obligation to provide effective assistance arose.
 
 See M.S.,
 
 115 S.W.3d at 544; Tex. Fam.Code Ann. § 107.013(a)(1).
 

 In analyzing the effectiveness of counsel in the context of a termination of parental rights, we follow a two-pronged test that was set forth by the United States Supreme Court in
 
 Strickland v. Washington
 
 to determine whether an attorney’s representation was so inadequate
 
 *191
 
 as to be in violation of the Sixth Amendment right to effective assistance of counsel.
 
 Id.
 
 at 545 (citing
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 2062, 80 L.Ed.2d 674 (1984)). In order to show ineffectiveness of counsel in a termination-of-parental-rights case, the appellant must show that counsel’s assistance fell below an objective standard of reasonableness and that counsel’s deficient assistance, if any, prejudiced the defendant.
 
 Id.
 
 (citing
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. at 2064). We acknowledge that there is a “strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
 
 Id.
 
 (quoting
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. at 2065).
 

 2. Preservation of Error
 

 TDPRS contends that Appellants did not preserve their ineffective assistance of counsel claims because they did not include this issue in either their statements of points or motions for new trial.
 

 a. Statements of Points
 

 Family code section 263.405(b) provides that “[n]ot later than the 15th day after the date a final order is signed by the trial judge, a party intending to appeal the order must file with the trial court a statement of the point or points on which the party intends to appeal.” Tex. Fam.Code Ann. § 263.405(b) (Vernon 2002). Father and Mother each filed statements of points, but neither included the ineffective assistance of counsel claim. TDPRS contends that Appellants waived the ineffective assistance of counsel claims because they did not include them in the statements of points.
 

 We addressed this very issue in
 
 In re W.J.H.,
 
 in which we held that a party’s failure to include a particular point or points in the statement of points filed under section 263.405(b) does not waive his or her right to raise the excluded points on appeal and does not bar our consideration of the point on appeal when an appellee does not demonstrate prejudice. 111 S.W.3d 707, 712-13 (Tex.App.-Fort Worth 2003, pet. denied). For the reasons stated in
 
 In re J.J.O.,
 
 we decline to reconsider that holding.
 
 See In re J.J.O.,
 
 131 S.W.3d 618, 626-27 (Tex.App.-Fort Worth 2004, no pet.).
 
 [1]
 
 Accordingly, Appellants did not waive their ineffective assistance of counsel claims by failing to include them in their statements of points.
 

 b. Motions for New Trial
 

 TDPRS also contends that Father and Mother waived their ineffective assistance of counsel claims because they did not raise them in their motions for new trial. TDPRS argues that rale of civil procedure 324(b)(1) requires the claims to be raised in the motions for new trial because they are complaints on which evidence must be heard. Tex.R. Civ. P. 324(b)(1). We disagree. An ineffective assistance of counsel claim can be raised for the first time on appeal without being preserved in the trial court.
 
 In re J.M.S.,
 
 43 S.W.3d 60, 64 (Tex.App.-Houston [1st Dist.] 2001, no pet.);
 
 see In re M.S.,
 
 115 S.W.3d at 546-50 (considering ineffectiveness of counsel even though no motion for new trial filed). By not presenting the issue in a motion for new trial and developing a record of ineffective behavior, the proponent of the claim has a difficult burden to overcome because the challenged
 
 *192
 
 action might be considered sound trial strategy.
 
 In re J.M.S.,
 
 43 S.W.3d at 64. But this does not preclude presentation of the issue on appeal.
 

 3. One-Year Deadline
 

 Both Father and Mother contend that their appointed counsel were ineffective because they did not object to the trial starting more than one year after the trial court appointed TDPRS as temporary managing conservator of the children. They assert that had their counsel objected, the trial court would have had no discretion but to dismiss the case and return their children to them.
 

 Section 263.401 of the family code provides that, unless the trial court has rendered a final order on the first Monday after the first anniversary of the date the court appointed TDPRS as temporary managing conservator in a suit affecting the parent-child relationship, the court “shall dismiss” a suit filed by TDPRS that seeks the termination of the parent-child relationship. Tex. Fam.Code Ann. § 263.401(a). The trial court may extend this deadline for up to 180 days if, by the Monday after the first anniversary date, the court finds that continuing TDPRS’s conservatorship of the child is in the child’s best interest and renders an order that complies with section 263.401(b).
 
 Id.
 
 § 263.401(b). If the trial court grants an extension, but does not render a final order within the 180-day period, it must dismiss the suit.
 
 Id.
 
 § 263.402(c).
 

 A party may, however, waive the right to object to the trial court’s failure to comply with these statutory deadlines. Under section 263.402(b), a party “who fails to make a timely motion to dismiss the suit or to make a motion requesting the court to render a final order before the deadline for dismissal ... waives the right to object to the court’s failure to dismiss the suit.”
 
 Id.
 
 § 263.401(b). To be timely, a motion to dismiss must be made before TDPRS has introduced all of its evidence, other than rebuttal evidence, at the trial on the merits.
 
 Id.
 

 It is undisputed that the trial started more than one year after TDPRS was awarded conservatorship of the children and that neither Father’s nor Mother’s attorney objected to the trial starting after section 263.401(a)’s one-year deadline. Father and Mother both contend that their attorneys’ waiver by failing to timely object to trial starting after the one-year deadline was ineffective assistance of counsel. But they fail to meet their burden to show that their appointed attorneys’ assistance fell below an objective standard of reasonableness.
 

 Mother points out that no extension order is included in the clerk’s record. TDPRS responds by referring us to the order extending the temporary orders during pendency of the suit. Furthermore, the reporter’s record contains two references to an extension, both made without objection by the other party. At one point TDPRS’s attorney asked a witness: “Are you aware that TDPRS has extended the dismissal date and we’re actually in the extension period?” At another, Father’s attorney asked a different witness: ‘You know this case had an extension to July?” and “Did you know that an extension was granted in May?”
 

 Section 263.401(b) simply requires the court to “render” an extension order. Tex. Fam.Code Ann. § 263.401(b). It does not require that the order be written.
 
 In re D.D.M.,
 
 116 S.W.3d 224, 230 (Tex.App.-Tyler 2003, no pet.);
 
 see also Phillips v. Tex. Dep’t of Protective & Regulatory Servs.,
 
 149 S.W.3d 814, 817 (Tex.App.-Eastland, 2004, no pet. h.). Thus, an extension of time for the dismissal dead
 
 *193
 
 line announced in open court may properly be rendered according to the statute.
 
 In re D.D.M.,
 
 116 S.W.3d at 230. Father and Mother have failed to provide an adequate record on appeal to show that the dismissal deadline was not orally rendered.
 
 [2]
 

 Furthermore, Father filed both a motion for continuance and a motion for extension. The motions, which were filed in April and May 2003, sought extension of trial settings for May 20, 2003 and June 16, 2003, respectively. In both motions, Father asserted that he needed more time to complete his service plan. There is no order on either motion in the clerk’s record. Nevertheless, a party who requests the trial court to reset the trial date beyond the original one-year deadline set out in 263.401(a) has agreed to an extension under section 263.401(b).
 
 In re B.W.,
 
 99 S.W.3d 757, 758 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Because Father sought an extension only weeks before the one-year deadline expired, Father’s attorney could have reasonably concluded that Father agreed to an extension beyond the one-year deadline.
 

 Father and Mother failed to show that them appointed counsel acted unreasonably by fading to object to trial starting after the one-year deadline. Accordingly, we need not address their arguments that counsel’s allegedly deficient performance prejudiced their defense.
 

 4. Fourteen-Day Adversary Heariny
 

 Father also argues that his counsel was ineffective for another reason. Father asserts that the trial court failed to have an adversary hearing within fourteen days after TDPRS was appointed as temporary managing conservator of the children. Tex. Fam.Code Ann. § 262.201(a) (Vernon 2002). As a result, Father contends that the trial court had no discretion but to return the children; therefore, he claims his counsel was ineffective because had his counsel but asked, the trial court would have been compelled to return the children. We disagree.
 

 The trial court does not lose jurisdiction if it fails to timely conduct the hearing. Instead, the remedy for the parents and TDPRS is to compel the trial court by mandamus to conduct the adversary hearing promptly.
 
 In re J.M.C.,
 
 109 S.W.3d 591, 595 (Tex.App.-Fort Worth 2003, no pet.);
 
 In re E.D.L.,
 
 105 S.W.3d 679, 687 (Tex.App.-Fort Worth 2003, pet. denied). Without addressing whether counsel acted competently, we hold that Father failed to show he was prejudiced by counsel’s failure to seek return of the children on the basis that there was no adversary healing within the fourteen-day window.
 

 C. Jurisdiction
 

 In his second issue on appeal, Father raises a confusing issue seeming to argue that the final judgment is void because the trial court failed to hold the full adversary hearing and enter a temporary order extending the TDPRS’s status as temporary managing conservator within fourteen days after the children were taken into possession as required by section 261.201(a). Father concedes that this court has held that both sections 262.201 and 262.401 are procedural rather than jurisdictional.
 
 See In re S.J.G.,
 
 124 S.W.3d at 243-44;
 
 In re J.M.C.,
 
 109 S.W.3d at 594;
 
 In re E.D.L.,
 
 105 S.W.3d at 688. But Father argues that the failure of the trial court to comply with those stat
 
 *194
 
 utes nevertheless has “jurisdictional implications.”
 

 Specifically, as we understand his argument, Father analogizes the June 28, 2002 order appointing the TDPRS as temporary managing conservator to a temporary restraining order, and the July 11, 2002 order extending the date for the adversary hearing to July 30, 2002 to an order extending the time for a hearing on a temporary injunction. Tex.R. Civ. P. 680. The problem, he says, is that there was no full adversarial hearing conducted on the extended date of July 30, 2002. Because the TDPRS did not proceed with an adversary hearing, he argues, both the June 28, 2002 order and the July 11, 2002 order expired and the trial court had no alternative but to order the children returned to the parents. Tex. Fam.Code Ann. § 262.201(a) (full adversary hearing required unless TDPRS returns children), § 262.201(b) (“court shall order the return of the child to the parent”), § 262.201(c) (unless court issues appropriate temporary order).
 

 We rejected the jurisdictional argument invoking Rule 680 in
 
 In re J.M.C.,
 
 in which the parent likewise asserted that, when the original ex parte temporary possession order expired without a full adversary hearing, the trial court was required to dissolve the order and render a final judgment returning the child to the parent. We pointed out that expiration of a temporary restraining order under Rule 680 does not deprive the trial court of jurisdiction over the subject matter of a civil suit, and nothing in that rule or in section 262.201 deprives the trial court of jurisdiction over a termination proceeding simply because a temporary possession order expired without a full adversary hearing. 109 S.W.3d at 595.
 

 Conceding that expiration of a temporary restraining order or temporary injunction normally has no jurisdictional implications, Father argues it is what the trial court must then do after the-orders expire that deprives the trial court of jurisdiction. He points to the mandatory nature of the requirement that the trial court “shall order the return of the child to the parent,” citing sections 262.201(b) and (c), arguing that such an order is a final judgment and, therefore, that jurisdiction is lost upon the expiration of the trial court’s plenary power under Texas Rule of Civil Procedure 324b(d). Father urges that the signing of a mandatory order under the statute is merely a ministerial duty, the right to which exists before the trial court signs the order. Notwithstanding the fact that the trial court did not sign an order returning the children to Father, he argues that such an order must be deemed to have been rendered by operation of law. Thus, he says, the trial court’s plenary power expired before the case proceeded to trial, and everything done after that time was void.
 

 In
 
 In re E.D.L.,
 
 we rejected a virtually identical argument that, because the court did not conduct an adversary hearing within fourteen days after the TDPRS took possession, and because the language of the statute is mandatory, the trial court lost jurisdiction and the case was therefore dismissed by operation of law. 105 S.W.3d at 686. As we pointed out in that case, the issue is not whether the statutory language is mandatory but what consequences follow a failure to comply.
 
 Id.
 
 We noted that, despite the language in section 262.201 mandating a hearing, the statute contained no corresponding provision dictating dismissal for noncompliance.
 
 Id.
 
 at 687.
 

 If the legislature had intended to require a dismissal as the result of a failure to hold an adversary hearing, it could have so provided.
 
 See Helena Chem. Co. v. Wilkins,
 
 47 S.W.3d 486, 495 (Tex.2001)
 
 *195
 
 (“If the Legislature had intended dismissal to be the consequence of a failure to hear a forfeiture case within the prescribed period, it could easily have said so.”). “Just because a statutory requirement is mandatory does not mean that compliance with it is jurisdictional.”
 
 In re E.D.L.,
 
 105 S.W.3d at
 
 687
 
 (quoting
 
 Albertson’s, Inc. v. Sinclair,
 
 984 S.W.2d 958, 961 (Tex.1999)). Mindful of all of the same policy arguments made in both cases, we decline to reconsider our decision that the failure to hold a fourteen-day adversary hearing does not deprive the trial court of jurisdiction over the termination proceeding.
 
 Id.
 
 at 688. We overrule Father’s second issue.
 

 II. SUFFICIENCY OF THE EVIDENCE
 

 A. Background
 

 Mother has five children: two daughters, B.T. and M.T., and three sons, M.J.R.B. (R.B.), T.B., and A.S. Her son A.S. was the subject of another proceeding, and parental rights as to A.S. were not addressed in this case. Father is the father of R.B., T.B., and A.S. B.T.’s father’s parental rights had been terminated prior to this case. M.T.’s alleged biological father was served, but he did not participate in this case. His parental rights to M.T. were terminated, and he does not appeal the termination.
 

 Mother was fourteen years old when B.T. was born on April 19, 1994. After B.T. was born, Mother dropped out of the ninth grade. In 1995 or 1996, she moved to an apartment complex where she routinely allowed B.T. to wander alone while she slept until midafternoon. CPS was notified. When the apartment manager, who would later become Mother’s mother-in-law, expressed concern for B.T., Mother told her to mind her own business. Mother began dating Father in 1995. Mother was sixteen and Father was twenty years old when R.B. was born on April 18, 1996. Mother and Father married on June 17, 1996.
 

 Father went to jail in July 1996, and Mother and her two children moved in with Father’s father, his stepmother Mer-rie Lee Vieman, and Vieman’s two children. In August 1996, they all moved into a one-room motel where they lived for about one year. Vieman took ten-month-old R.B. to get his two-month shots. Mother later moved with the children to their own apartment. A TDPRS caseworker noticed a dark brown substance that he believed to be excrement on the stroller where R.B. also ate. He demanded that Mother clean the apartment, but she refused.
 

 The record is unclear as to when Father was released from jail or reunited with Mother, but Mother and Father lived in Brownwood from August to December 1997, and T.B. was born on October 22, 1997. Shortly before T.B.’s birth, they contacted Father’s father and Vieman because they were homeless. They were also being investigated by TDPRS over the children’s severe diaper rashes that were being left untreated.
 

 Mother and Father moved to Arlington in December 1997. The three children, including six week old T.B., moved in with Vieman. Vieman returned the children to Mother and Father in January 1998. Mother and Father moved with the children to Lubbock in January or February of 1998.
 

 Mother and Father split up in April 1998. On April 6,1998, Father was sent to the penitentiary after he violated his probation. Mother sent the two boys, R.B. and T.B., to live with Father’s father and Vieman. At the time, TDPRS was investigating diaper rash so bad that R.B.’s bot
 
 *196
 
 tom was bleeding. From April to August 1998, Mother failed to maintain contact with the boys or their caretakers. She had her next contact with R.B. and T.B. in November 1998, but she left her daughter B.T. alone in the car for thirty minutes while she visited with the boys. Mother did not see the boys again until June 2001, and she provided no support for them.
 

 Mother, her mother Susan Taylor, her half-brother Jeff Walton, and B.T. moved in with Donna Kessler in September or October 1998. A.S. was born on December 29, 1998. Kessler observed bad parenting on Mother’s part. B.T. had bruising where Mother had grabbed B.T.’s arm and twisted it. Mother also screamed at the baby A.S.
 

 Mother left Kessler’s home and moved back to Lubbock with B.T. and A.S. in February or March 1999. In April 1999, TDPRS investigated a bruise in the shape of a slap mark on three-and-a-half-month old A.S.’s face. Taylor was babysitting A.S. when the slap mark appeared on A.S.’s face, and Mother told hospital workers that she thought Taylor caused the bruise. Taylor had a history with TDPRS, and Mother had been repeatedly warned not to allow Taylor to supervise the children. Nevertheless, Mother continued to leave A.S. alone with Taylor until Taylor left the area to avoid the physical abuse investigation.
 

 The police were summoned to Mother’s home in April or May 1999 where they found B.T. and A.S. unsupervised. B.T. was found wandering alone around the trailer park. The house had broken windows and locks, a stopped-up sink, and raw sewage. Mother sent B.T. and A.S. to live with Kessler in May 1999 because she did not want TDPRS to put them into foster care. In June 1999, Mother began the psychological counseling and parenting classes provided to her by TDPRS, but dropped the sessions due to lack of interest.
 

 B.T. and A.S. came to live with Mother in July or August 1999. In August 1999, Mother moved into rent-free housing provided by TDPRS, but she violated her lease by having friends and relatives stay with her.
 

 On October 13, 1999, Father was released from prison and moved in with his father and Vieman, who were still taking care of R.B. and T.B. The boys frequently smeared feces on the walls, but Father did not consider it his responsibility to clean up the messes made by his children. Vie-man eventually asked Father to move out and to take R.B. with him because R.B. had major psychological problems that required attention. R.B. exhibited jealousy toward his nine-month-old brother T.B., stabbed T.B.’s port-o-crib with a knife, and put pillows over T.B. Father later left R.B. with Vieman for what was supposed to be a twenty-four-hour visit, but Father failed to check in with Vieman for three days.
 

 In January 2000, Lubbock TDPRS was concerned about a “very bad” rash on the back of A.S.’s legs and took A.S. to the hospital. TDPRS prepared to remove the children from Mother’s care in January 2000, so Mother sent B.T. and A.S. to live with Kessler. Both of the children had lice. B.T. had open sores and lice an inch deep and had missed two weeks of school because of lice.
 

 Mother lived with Taylor in Rockwall from summer 2000 until July 10, 2001. In July 2000, B.T. made a sexual molestation outcry against Mother’s half-brother. Mother pressed charges against her half-brother, and he was convicted for sexually assaulting B.T. and was in prison at the time of trial.
 

 M.T. was born on May 5, 2001. In June 2001, Father and Mother reunited after a
 
 *197
 
 three year separation and moved to Hurst. B.T. returned to live with Mother and Father in June 2001, and A.S. returned six months later. In August 2001, Mother surrendered managing conservatorship of A.S. to Kessler. Neither Mother nor Father complied with a court order to pay Kessler child support. In October 2001, Vieman returned T.B. to Mother and Father. T.B. had just turned four and had lived with Vieman since he was six weeks old. Kessler returned A.S. to live with Mother and Father in November 2001.
 

 TDPRS investigated the family in January 2002 because of braises and scratches on the children. Mother explained that she wouldn’t have scratched the children if she had sculptured nails, and Father acknowledged the braises, but was not concerned about them. B.T. told a TDPRS investigator that Mother instructed her not to disclose that Mother “smacks” her. B.T. also told the investigator that Mother “hates me” and that Mother was not a good mommy. B.T. had ringworm, bruises, and a fabric burn on her arm. During this time period, A.S. told Kessler that Mother hit him on the top of his head. He had a faint bruise and a headache. Mother and Father’s home continued to get dirtier.
 

 Catholic Family Services attempted to work with Mother and Father from February 8, 2002 to July 14, 2002 because Mother and Father chose to work with Catholic Family Services instead of TDPRS. Mother and Father failed to take advantage of the classes and counseling offered by Catholic Family Services and offered poor excuses for their failures to do so. The conditions of the home during this time were poor, and the children had lice.
 

 In June 2002, TDPRS became concerned about a braise on A.S.’s face. Mother admitted that she caused the bruise. She told Kessler that she “freaked out” and hit A.S. Mother later claimed that she hit three-and-a-half-year old A.S. in the face to force him to spit out what she thought was a poisonous mushroom. B.T. said that she told Mother that A.S. had a cracker in his mouth, not a mushroom, but Mother would not stop hitting A.S. Father and Kessler both testified that the braise was a bad bruise. Father admitted that the braise was caused by substantial force. He gave contradictory statements about whether he was present when Mother hit A.S., causing the bruise.
 

 TDPRS removed the children on June 27, 2002. Mother was subsequently arrested on outstanding warrants. The house was filthy and unsafe. The children were unclean and wearing dirty clothes, had lice, and were hungry. A.S. was placed with Kessler, with whom he had lived most of his life, and the other four children were placed with a foster mother. The foster mother testified that when the children came into her care, they were unaccustomed to eating utensils, bathing, brushing their teeth, or toilet paper.
 

 R.B. was hospitalized for psychiatric care three times while he was in foster care. Mother and Father did not respond to any of the notifications that he had been hospitalized. Instead, they screamed at TDPRS workers about it at a child visitation, aware that the children could hear them. B.T. was moved to tears by the tantrum. Father and Mother sporadically attended the classes and counseling sessions provided by TDPRS, and they quit attending the few they started. They claimed that they had transportation problems, but there was evidence that they were able to get to visitations and fast food restaurants at the time they claimed they could not get to classes. They were evicted from the Hurst trailer park in November 2002. They refused TDPRS’s offer to
 
 *198
 
 help them obtain subsidized housing and subleased an Irving apartment.
 

 On December 4, 2002, Mother and Father were told that TDPRS planned to recommend termination. They did not attend the Permanency Planning Team meeting where the proposed termination was discussed, despite having been given a map and directions to the meeting place. At the Christmas 2002 visitation, the children gave Mother and Father presents. Mother and Father had no gifts for the children and told them that their Christmas presents would come in July after the parents won" the court case. In July 2003, Mother and Father told B.T. that she would be given to an aunt after they won the court case because Mother and Father could give her to whomever they wanted.
 

 After a five-day trial, the jury found that both Mother and Father engaged in conduct or knowingly placed B.T., R.B., T.B., and M.T. with persons who engaged in conduct that endangered the physical or emotional well-being of the children, and that termination of Mother’s and Father’s parental rights to B.T., R.B., T.B., and M.T. would be in the children’s best interest. Mothers parental rights in B.T., R.B., T.B., and M.T. and Father’s parental rights in R.B., T.B., and M.T. were terminated on August 18, 2003. On appeal, Father asserts that the evidence is factually insufficient to support the endangerment findings as to him, and both parents assert that the evidence is factually insufficient to support the finding that termination of their parental rights is in the best interest of the children.
 

 B. Standards of Review
 

 A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”
 
 Santosky v. Kramer,
 
 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). “While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”
 
 In re C.H.,
 
 89 S.W.3d 17, 26 (Tex.2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit. Tex. Fam.Code Ann. § 161.206(b) (Vernon Supp.2004-05);
 
 Holick v. Smith,
 
 685 S.W.2d 18, 20 (Tex.1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.
 
 Holick,
 
 685 S.W.2d at 20-21;
 
 In re D.T.,
 
 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh’g).
 

 In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001 (Vernon 2002);
 
 Richardson v. Green,
 
 677 S.W.2d 497, 499 (Tex.1984);
 
 Swate v. Swate,
 
 72 S.W.3d 763, 766 (Tex. App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.
 
 Tex. Dep’t of Human Servs. v. Boyd,
 
 727 S.W.2d 531, 533 (Tex.1987).
 

 Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by “clear’ and
 
 *199
 
 convincing evidence.” Tex. Fam.Code ANN. §§ 161.001, 161.206(a);
 
 In re G.M.,
 
 596 S.W.2d 846, 847 (Tex.1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.
 
 G.M.,
 
 596 S.W.2d at 847;
 
 D.T.,
 
 34 S.W.3d at 630. It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.” Tex. FaM.Code Ann. § 101.007 (Vernon 2002).
 

 The higher burden of proof in termination cases alters the appellate standard of factual sufficiency review.
 
 In re C.H.,
 
 89 S.W.3d at 25. “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”
 
 Id.
 
 In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.
 
 Id.
 
 Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.
 
 Id.
 
 at 28.
 

 C. Discussion
 

 1. Endangerment
 

 Father challenges the trial court’s findings that he knowingly placed or knowingly allowed his children to remain in conditions or surroundings that endangered their physical or emotional well-being, and that he engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. Tex. Fam.Code Ann. §§ 161.001(1)(D),(E). In an involuntary termination proceeding, endangerment means to expose a child to loss or injury or to jeopardize a child’s emotional or physical health.
 
 Boyd,
 
 727 S.W.2d at 533. Father raises only two arguments as to why he believes the evidence is insufficient to support the endangerment findings.
 

 First, Father argues that the evidence is factually insufficient because there is no evidence that he ever struck any child hard enough to leave a mark. That is not the test, however. Furthermore, a child need not suffer actual physical injury for a finding of endangerment to be made.
 
 Id.
 
 Nevertheless, there was evidence that Father struck the children with a metal studded belt. All of the children talked about being “smacked” by Father and Mother, they were frequently observed with bruises, and they expressed concern that they would be “smacked” if they were returned to their parents. Furthermore, Father left the children with Mother, who frequently struck them. Placement of a child with an abusive parent or relative is endangerment.
 
 In re J.M.M.,
 
 80 S.W.3d 232, 242 (Tex.App.-Fort Worth 2002, pet. denied),
 
 disapproved on other grounds, In re J.F.C.,
 
 96 S.W.3d 256 (Tex.2002). And Mother does not challenge the court’s findings that she endangered the children.
 

 Second, Father claims that TDPRS based its decision to remove the children upon the isolated incident of Mother striking A.S. when she thought A.S. had a poisonous mushroom in his mouth, and asserts that this incident does not provide sufficient evidence to support termination of his parental rights. The TDPRS case worker testified that this striking incident was “the straw that broke
 
 *200
 
 the camel’s back.” However, there was overwhelming other evidence to support removal, such as the continually filthy home conditions, physical abuse, neglect, lack of supervision, and failure to address the children’s health concerns. Endangerment can occur through both the acts and omissions of a parent, and parental neglect can be as dangerous to a child’s well-being as direct abuse.
 
 In re M.C.,
 
 917 S.W.2d 268, 270 (Tex.1996). The record is replete with evidence of endangerment beyond the mushroom-slapping incident.
 

 We have reviewed the record extensively, and under the applicable standard of review, we hold that the evidence is factually sufficient to constitute clear and convincing evidence to support the trial court’s finding that Father engaged in conduct that endangered the children’s physical or emotional well-being.
 

 2. Best Interest
 

 Both Mother and Father challenge the factual sufficiency of the evidence to support the jury’s findings that termination of their parental rights was in the best interest of the children. Tex. Fam.Code ANN. § 161.001(2). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the following:
 

 (1) the desires of the child;
 

 (2) the emotional and physical needs of the child now and in the future;
 

 (3) the emotional and physical danger to the child now and in the future;
 

 (4) the parental abilities of the individuals seeking custody;
 

 (5) the programs available to assist these individuals to promote the best interest of the child;
 

 (6) the plans for the child by these individuals or by the agency seeking custody;
 

 (7) the stability of the home or proposed placement;
 

 (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
 

 (9) any excuse for the acts or omissions of the parent.
 

 Holley v. Adams,
 
 544 S.W.2d 367, 371-72 (Tex.1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.
 
 C.H.,
 
 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children.
 
 Id.
 
 On the other hand, the presence of scant evidence relevant to each
 
 Holley
 
 factor will not support such a finding.
 
 Id.
 

 B.T., R.B., and initially T.B., were bonded to their parents. M.T. was only two years old at the time of trial. All of the children did well in foster care, and they expressed fear and anger when the parents told them that they were returning home because they thought Mother and Father would continue to “smack” them.
 

 B.T. had been required to assume a parental role in the home. Mother expected B.T. to wake her in the mornings, to prepare breakfast and lunch for her younger siblings, and to wash the dishes. She would be “smacked” if she did not do it exactly right. She had difficulty giving up her parental role while in foster care. She was sexually assaulted by Mother’s half-brother, and while Mother’s half-brother was convicted, Mother failed to follow through with getting B.T. the counseling she needed, especially when she had flashbacks of the attack.
 

 
 *201
 
 R.B. was violent toward his siblings, especially his younger brother T.B., and could not be controlled by his foster parent. He attempted to injure T.B. several times and threatened to cut off his siblings’ heads. He was admitted to a mental hospital three times while in foster care and eventually removed from the foster home where B.T., T.B., and M.T. were placed and placed in a therapeutic foster home. R.B. also inflicted injury on himself, primarily by head banging, but Mother and Father trivialized his problems and thought he simply sought attention. B.T., R.B., and T.B. were prescribed medication for ADHD after being removed from the home.
 

 Mother and Father had failed to provide the children with the medical attention they needed in the past. Mother unsuccessfully attempted to treat repeated bouts of diaper rash and lice infestations. Mother failed to get baby T.B. his immunizations. Mother and Father physically abused the children. They also locked the children in their bedroom. R.B. and T.B. were so afraid to come out that they urinated in the vents. Father made the children drink hot sauce before they could have popsicles. Throughout Mother’s and Father’s long history with TDPRS, they maintained filthy, unsanitary house conditions and refused to clean up the various homes they lived in. They failed to supervise the children, letting toddlers roam alone or failing to inform caretakers of Mother’s or Father’s whereabouts.
 

 Mother was bonded to and affectionate with B.T. She enlisted help when she felt she was not able to care or provide for her children, as when she sent the children to live with Father’s father and stepmother or with Kessler. Mother also claimed that she slapped A.S. because she was in a panic trying to protect him from a poisonous mushroom, not because she was trying to harm him. She occasionally made attempts to clean the home and completed parenting and anger management classes.
 

 Father was not employed after the children were removed from the home because he had injured his right wrist in an on-the-job injury and was on workers’ compensation. He participated in a bowling league from June 2002 to February 2003 and testified that his doctor told him he could bowl left-handed, but could not work. Mother sporadically worked as a bartender or a nurse’s aid at various nursing homes.
 

 Mother and Father were offered many programs to assist them, but they failed to take advantage of those programs in the past, and there was no indication they would do so in the future. Mother and Father had no plans for the children if they were returned. They had recently purchased a trailer home in Lubbock, but there was no indication that they would be any more stable in that location than they had been in the past. Mother told B.T. that when the children were returned to her, she would send B.T. to live with Mother’s sister. In contrast, TDPRS planned for the children to be adopted and believed that all four children could be adopted by the same family, even though the foster mother with whom they were placed was not in a position to adopt the children.
 

 Mother offered no excuses for her acts or omissions as a parent. The only excuse offered by Father for not cooperating with TDPRS’s service plan was that he did not think he needed any improvement.
 

 We have reviewed the record extensively, and under the applicable standard of review, we hold that the evidence is factually sufficient to constitute clear’ and convincing evidence to support the trial court’s finding that termination of Mother’s and Father’s parental rights was in the best interest of B.T., R.B., T.B., and
 
 *202
 
 M.T. We overrule Mother’s and Father’s suffieiency-of-the-evidence points.
 

 III. CONCLUSION
 

 Having overruled all of Father’s and Mother’s points on appeal, we affirm the trial court’s judgment terminating their parental rights.
 

 [1]
 

 . TDPRS also urges us, for the second time, to reconsider our opinion in
 
 In re S.J.G.,
 
 124 S.W.3d 237, 240 (Tex.App.-Fort Worth 2003, pet. denied) (holding that failure to file statement of points is not jurisdictional defect that prevents appellate court from addressing issues on appeal). We again decline to do so.
 
 See In re J.J.O.,
 
 131 S.W.3d at 626-27.
 

 [2]
 

 . An allegation of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.
 
 Thompson v. State,
 
 9 S.W.3d 808, 814 (Tex.Crim.App.1999).