DMY Draft B printed August 20, 2010 (2:00PM)









Affirmed and Memorandum Opinion filed October 26, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00693-CV

___________________

 

IN THE INTEREST OF I.L.L. anD D.R.M.S.



 



 

On
Appeal from the 315th District Court

Harris County, Texas



Trial Court Cause No. 2007-10696J

 



 

 

MEMORANDUM OPINION

This
appeal is from a judgment terminating the parental rights of Jennifer
Battershell to I.L.L. and D.R.M.S.[1] 
Battershell claims the evidence is legally and factually insufficient to support
the trial court’s judgment.  We affirm.

STANDARD OF REVIEW

In a proceeding to terminate the parent-child
relationship brought under section 161.001 of the Texas Family Code, the
petitioner must establish by clear and convincing evidence one or more acts or
omissions enumerated under subsection (1) of 161.001 and that termination is in
the best interest of the child under subsection (2).  Tex. Fam. Code Ann. §
161.001 (Vernon Supp. 2009); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005); In
re U.P., 105 S.W.3d 222, 229 (Tex. App. -- Houston [14th Dist.] 2003, pet.
denied).  Clear and convincing evidence is that measure or degree of proof that
will produce in the mind of the trier of fact a firm belief or conviction as to
the truth of the allegations sought to be established.  In re C.H., 89
S.W.3d 17, 25-26 (Tex. 2002).

In a legal sufficiency review, we consider all the
evidence in the light most favorable to the finding to determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its
finding was true.  In the Interest of J.F.C., 96 S.W.3d 256, 266 (Tex.
2002).  This means we must assume the factfinder resolved disputed facts in
favor of its finding if a reasonable factfinder could do so.  Id.  We
disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible, but we do not disregard undisputed facts,
regardless of whether they support the finding.  Id.  If we determine no
reasonable factfinder could form a firm belief or conviction the matter to be
proven is true, we must conclude the evidence is legally insufficient.  Id. 

In a factual sufficiency review, we give due
consideration to evidence the factfinder could reasonably have found to be
clear and convincing.  Id.  Our inquiry is whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction about the
truth of the State’s allegations.  Id.  We consider whether disputed
evidence is such that a reasonable factfinder could not have resolved that
evidence in favor of its finding.  Id.  If, in light of the entire
record, the disputed evidence is so significant that the factfinder could not
reasonably have formed a firm belief or conviction, we must find the evidence
is factually insufficient.  Id.   

THE EVIDENCE

Battershell gave birth to I.L.L., a boy, in 2004 and
to D.R.M.S., a girl, in 2006.  According to Battershell, she became pregnant
with I.L.L. as a result of rape.[2] 
Battershell believed the father of D.R.M.S. to be Robert (“Bobby”) Smith.  

In December 2007, allegations of physical abuse of
I.L.L. were reported to the Department of Family & Protective Services
(DFPS).  The report indicated I.L.L. had been taken to the doctor with numerous
marks on his neck and chest.  

Dolores Anderson, an investigator with DFPS, located
I.L.L. at daycare and found red, purple, and green bruises on the lower part of
his back, along his buttocks, on the inside of his thighs, and on the back of
his legs.  At that time, the marks on I.L.L.’s neck and chest, which prompted
the initial report, were fading.  

A daycare worker spoke with Battershell about the
bruising, and Battershell said I.L.L. had been spanked.  Tracey Joseph, the
manager for the daycare center, also indicated that Battershell had
acknowledged the spanking.  Joseph also witnessed bruises on I.L.L.’s back,
down his buttocks, and around his legs, and she indicated there were too many
bruises on him to be self-inflicted.

Because the bruises were not self-inflicted, the
daycare was required to report the injuries to DFPS.  Joseph prepared to do so
but was informed that a report had already been made to DFPS.  When Battershell
came to pick up her son, a DFPS worker was already present and informed her
that I.L.L. could not leave with her.  With that, Battershell ran out of the
building.  

DFPS investigator Anderson contacted police to
accompany her to the home.  When they arrived, they saw Smith arriving with
D.R.M.S.[3] 
Anderson informed Smith that, due to the allegation and what she observed, DFPS
would request that the children voluntarily be placed in another home.  Smith
said Battershell had gone to pick up I.L.L. and would shortly return. 

Battershell arrived crying about ten minutes later, and
asked “what was going on.”  Anderson told her there were allegations of abuse,
and the bruises she witnessed on I.L.L. were consistent with the report. 
Battershell initially told Anderson she did not know how I.L.L. received the
bruises.  

After being informed that Anderson had spoken with
the staff at daycare, Battershell said Smith had spanked I.L.L.  Smith,
however, told Anderson that he knew nothing about I.L.L.’s injuries.  Later,
Battershell indicated that she noticed the bruises on I.L.L. when she bathed
him and told Smith not to punish the children again.  According to Battershell,
Smith said he would not spank the children again.

When asked to provide names of anyone that would
voluntarily take the children, Battershell could not provide any names.  Smith
gave a number for his mother, but the phone was no longer in service.  DFPS
removed both children and placed them in foster care.

Battershell and Smith were referred to Dr. Walter
Scott Newsome by DFPS for psychological assessment.  Battershell told Dr.
Newsome she had spanked I.L.L. and left bruises.  Later, Battershell reported
that Smith does “the punishing.”  Smith admitted to spanking I.L.L.  Battershell
said she had been with Smith for about three years.  She also admitted to using
alcohol, cocaine, and marijuana in the past, but denied any current drug use.  

Dr. Newsome also assessed Smith.  Smith admitted
going to prison four times for battery and illegal possession of drugs and
firearms.  At the time in question, Smith reported he was living in an
apartment with Battershell, along with another family he refused to identify. 
Battershell had failed to report this to Dr. Newsome, despite a direct question
about who lived with them.  

Smith reported he has one child with Battershell,
D.R.M.S, and she was pregnant with his second child.  Smith had lived with
Battershell for the past year and a half.  He stated that although he is not
I.L.L.’s biological father, he claims I.L.L. as his child.  

Smith reported he had been through alcohol and drug
treatment programs while incarcerated and after release, but admitted he
continues to drink alcohol and use drugs.  Smith used alcohol the night before
his evaluation with Dr. Newsome and had used cocaine and marijuana within the
past few weeks.  Smith claimed he did not use drugs in the children’s
presence.  A hair sample collected from Smith on December 12, 2007, tested
positive for cocaine and marijuana.  A hair sample taken March 14, 2008,
likewise tested positive for cocaine and marijuana.  

Battershell confirmed that she was aware Smith used
marijuana, cocaine and “X.” She claimed Smith would not do drugs in front of
her or the children.  Battershell also claimed she never left the children with
Smith when he was on drugs or “doing drugs.”  She had no knowledge of Smith
selling drugs but knew he had been incarcerated for drug-related offenses.  

Dr. Newsome concluded Smith “has a high probability
of physically abusing any children in his care.” He recommended Smith not have
any contact with children.  Dr. Newsome’s report states Smith “poses a high
risk of physical abuse to any children in his care. . . There are no services
that could even conceivably help Mr. Smith develop into a responsible and
nurturing parent. . . He simply should not be allowed to have contact with
children.”  

According to Dr. Newsome, Battershell was very
defensive and “trying to cover up.”  Dr. Newsome recommended Battershell
receive individual therapy.  He did not think she was capable of protecting her
children from Smith.  Dr. Newsome indicated there is a likelihood of harm if
the children were placed with Battershell and Smith.  Newsome would not
recommend placement of the children with Battershell if she were living with or
having a relationship with Smith.  

In April 2008, Battershell gave birth to her third
child; Smith is the child’s father.  In June 2008, I.L.L. and D.R.M.S. were
returned to Battershell’s care.  After hurricane Ike, Battershell lost her home
and her job.  She went to San Antonio and then Dallas, where she got a job.
Battershell kept in contact with her caseworker, but she also admitted that the
caseworker did not know where she was for a period of time.  

Battershell stayed with a cousin in San Antonio for
several months and then came back to Houston.  She claimed to have called her
caseworker and left messages, but did not leave a phone number because she did
not have a phone.  According to Battershell, she returned to Houston so the
caseworker could see how the children were doing and to collect their
belongings.  

She was arrested in Houston for child abandonment and
prostitution. The record reflects she was convicted of the prostitution charge
in December 2008.  Battershell had also been convicted of prostitution prior to
the birth of I.L.L.  

According to Battershell, she “got stranded in
Houston” and “prostituted to make sure that the room for my kids was paid for
since I got stuck here.”  Battershell claims she was charged with child
abandonment because the person watching the children at the hotel left the
room.  She did not know he would leave the children.  She understood he had
only gone to a snack machine to get food for the children.  According to her,
the children were not harmed in any way.  

Battershell indicated she did not do anything to
intentionally hurt the children.  Battershell claimed she pled “no contest” to
the charge of child abandonment so she could see her children and get out of
jail.  

When she was arrested, Battershell called Smith’s
cousin “Slim,” and he said he would care for the children until she was
released.  Battershell thought she would only be in jail a few days, but she
was actually incarcerated for “three or four months.”  She did not know where
the children were during that time.  While Battershell was in jail, the court
required the children to be returned to DFPS.  It was Smith who returned them.

In March 2009, Battershell was again charged with
prostitution.  She pled “guilty” and was sentenced to 90 days in the Harris
County Jail.  Battershell submitted a financial affidavit with a request for
appointment of counsel regarding that charge. In her affidavit, signed March 27,
2009, Battershell listed Smith, along with I.L.L. and D.R.M.S., as persons
living with her or otherwise dependent upon her for support. 

In April 2009, Smith was charged with possession of
cocaine.  He entered a plea of “guilty” and was sentenced to 60 days in Harris
County Jail in June 2009.  

On June 29, 2009, the bench trial in this case began. 
In discussing her relationship with Smith, Battershell claimed she stopped
living with him in December 2007.  However, Dakendria Wheeler testified she
lived with Smith and Battershell from February to April of 2008.  According to
Wheeler, Smith stopped living with Battershell after April 2008. 

 Battershell testified that she was currently staying
with a friend but would have a place of her own next month.  Battershell said
if the court told her Smith could not be around the children she would comply
in order to get the children back.  However, she did not agree that Smith
should not be around the children and stated, “He’s a really good father.”  The
next day, when Battershell continued her testimony, she said she would not let
Smith have access to the children. 

Battershell testified that she and Smith got into a
fight on a bus a few days earlier when she told him he could not see the
children.  As a result of that altercation, Battershell pressed charges against
Smith.  At the time of trial, Battershell was working at Burger King and had
begun taking classes to become a medical assistant.  Battershell said she was
currently living with a man she met on the street as a prostitute who helped
her “get out of it.” 

Battershell testified she intended to move to
Louisiana to live with her mother if the
children were returned to her.  Battershell told Dr. Newsome her mother is
bipolar and on disability for hip and leg problems.  Battershell also told him
she does not talk with her mother because her mother’s boyfriend is prejudiced,
and her mother will not let D.R.M.S. stay at her house because the child is
black.  When the children were first removed from her care, Battershell had not
had contact with her mother for more than a month.  

Dakendria Wheeler testified that Battershell was a
good mother, and that the children appeared to be very happy, well-clothed, and
well-fed.  Wheeler testified she observed Battershell and Smith every day for more
than a year and never saw them yell at the children or beat them.  Wheeler did
not observe any bruising on the children other than what was normal for children
their age and had opportunities to observe them in short sleeves or swim
suits.  Wheeler said she would trust Battershell with her child and believed
Battershell was a good parent to both children.  Wheeler testified that the
children loved Battershell very much.  

Tracey Joseph believed I.L.L. to be very bonded to
his mother.  According to Joseph, Battershell was involved with the daycare and
was punctual picking up I.L.L.  Joseph testified that, but for the bruises on
I.L.L., she would not have any concerns about Battershell or her children. 
I.L.L. was always clean and well-groomed, and Battershell was always on time. 
I.L.L. was a “very happy kid.”  

Rhonda Washington, the supervisor of the caseworker
for Battershell’s children, testified that Battershell completed her family
plan of service and the children were returned to her in June 2008.  In
December 2008, the children were again removed, and Battershell was not given a
new plan of service at that time.   

According to Washington, Battershell successfully
completed individual therapy as ordered.  When the children were returned to
DFPS in December 2008, they were healthy, happy, and appropriately clothed. 
The children wished to live with Battershell.  Washington also testified that
Battershell had been given a new plan of service regarding her third child that
encompassed all the children. 

Washington testified that under the new plan of
service Battershell had not provided any indication of stable housing or of
compliance with a renewed request to undergo individual therapy.  Washington
testified that in her opinion Battershell is not stable or capable of providing
a safe and stable home.  Further, Washington did not believe Battershell had addressed
the reasons the children came into the care of DFPS.  Washington testified she
is concerned about Battershell’s history of prostitution because it has caused
her to leave the children in situations where she may not be able to return. 
Washington characterized the home environment as insecure and unstable.  

Washington testified the children are currently in a
foster home.  The foster parents are interested in adopting the children and
can provide a suitable environment.  The children have bonded with the foster
parents and their medical and physical needs are being met.  The children are
developmentally on target.  I.L.L. does have a speech issue but has made
progress and is doing well.  None of the children are on medication, and they
are adoptable.  Washington testified it would be in the children’s best
interest for Battershell’s parental rights to be terminated and that, if
permitted, the children would find permanency in their current foster home.  

 

ANALYSIS

The trial court found that (1) Battershell knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings which endangered their physical or emotional wellbeing; (2)
Battershell engaged in conduct or knowingly placed the children with persons
who engaged in conduct that endangered their physical or emotional well-being;
and (3) termination was in the best interest of the children.  Tex. Fam. Code
§§ 161.001(1)(D), (E), and 161.001(2) (Vernon Supp. 2009).  In six issues,
Battershell argues the evidence is legally and factually insufficient to
support these findings.

Evidence of Endangerment

Subsections D and E of the statute both focus on
endangerment but differ regarding the source and proof of endangerment. 
Subsection D concerns the child’s living environment rather than the conduct of
the parent, although parental conduct is certainly relevant to the child’s
environment.  See In re J.T.G., 121 S.W.3d 117, 125 (Tex.App.-Fort Worth
2003, no pet.); In re B.S.T., 977 S.W.2d 481, 484 (Tex.App.-Houston
[14th Dist.] 1998, no pet.).  Under subsection E, the cause of the endangerment
must be the parent's conduct and must be the result of a conscious course of
conduct rather than a single act or omission.  See In re J.T.G., 121
S.W.3d at 125; In re B.S.T., 977 S.W.2d at 484.   

Endangerment can be exhibited by both actions and
failures to act.  In re U.P., 105 S.W.3d at 233.   It is not necessary
that the parent’s conduct be directed at the child or that the child actually
be injured; rather, a child is endangered when the parent’s course of conduct
creates a potential for danger of which the parent is aware but disregards.  See
In re U.P., 105 S.W.3d at 233; In re N.R., 101 S.W.3d 771, 776
(Tex.App.-Texarkana 2003, no pet.);In re S.M.L.,171 S.W.3d 472, 477
(Tex.App.-Houston [14th Dist.] 2005, no pet.).  “Endanger” means “to expose to
loss or injury; to jeopardize.”  Texas Dept. of Human Services v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987).  If the evidence shows a course of conduct
which has the effect of endangering the physical or emotional well-being of the
child, a finding under subsection (E) is supportable.  Boyd, 727 S.W.2d
at 534.  

The record establishes that Battershell has three
convictions for prostitution.  The first conviction occurred before Battershell
had any children.  The second conviction, however, occurred on December 10,
2008, after the children were returned to Battershell and while they were in
her care.  Battershell left the children in a hotel room with an individual who
then left them alone.  Battershell was incarcerated for three or four months
and during that time the children were in the care of Smith.  The third
conviction occurred on March 27, 2009, shortly after her release stemming from
the second conviction and while the children were still in the care of DFPS. 

Imprisonment is an appropriate factor to consider.  In
re S.M.L., 171 S.W.3d 472, 478 (Tex. App. – Houston [14th Dist.] 2005, no
pet.).  An incarcerated parent is absent from the child’s daily life and unable
to provide support.  Id. at 479.  A parent who repeatedly commits
criminal acts subjects herself to the possibility of incarceration and
negatively impacts a child’s living environment and emotional well-being.  Id. 
Although imprisonment alone does not support a finding of endangerment,
evidence, including imprisonment, that demonstrates a course of conduct that
has the effect of endangering the child’s physical or emotional well-being
supports a finding of endangerment under subsection 161.001(1(E).  In re C.A.B.,
289 S.W.3d 874, 885  (Tex.App.—Houston [14th Dist.] 2009, no pet.). 
Battershell’s deliberate choice to continue to engage in prostitution is
evidence of a course of conduct which has the effect of endangering the
physical or emotional well-being of her children.  

Moreover, the record establishes two occasions on
which I.L.L. was injured.  The first occasion resulted in the initial call to
DFPS for numerous marks on I.L.L.’s neck and chest.  The second occasion was
when I.L.L. was examined at daycare and found to have multiple bruises on his
back, buttocks, thighs and legs.  Battershell told a daycare worker and Dr.
Newsome that she spanked I.L.L. and caused his bruises.  She later blamed
Smith.  Smith initially denied any knowledge of I.L.L.’s injuries but
subsequently admitted to spanking him.  At trial, Battershell testified that she
saw bruises on I.L.L. and told Smith to stop spanking the children.  

This evidence supports a finding that Battershell
caused I.L.L.’s injuries.  It also supports a finding that Battershell failed
to protect I.L.L. from injuries caused by Smith.  Battershell did not report
the second set of bruises and did not take necessary action to prevent Smith
from injuring I.L.L. again.  Even so, Battershell maintained her relationship
with Smith and continued to place her children in his presence and care.  See
In re B.T., 154 S.W.3d 200, 213 (Tex. App. – Fort Worth 2004, no pet.) (“Placement
of a child with an abusive parent or relative is endangerment.”)  Upon
investigation of I.L.L.’s injuries, Battershell lied to DFPS, either when she
claimed she had caused the bruises or when she later claimed it was Smith. 
Battershell’s actions or her failure to act, along with her refusal to be
truthful, demonstrate a conscious course of conduct that caused injury to
I.L.L. and created a potential of danger to her other children. 

Considering all the evidence in the light most
favorable to the trial court’s finding, a reasonable trier of fact could have
formed a firm belief or conviction Battershell engaged in conduct which
endangered their physical or emotional well-being.  Further, the disputed evidence
is not so significant that a reasonable factfinder could not have resolved that
disputed evidence in favor of its finding.  Accordingly, the evidence is
legally and factually sufficient to support the termination of Battershell’s
parental rights under section 161.001(1)(E).  Issues one and two are
overruled.  

            In issues three
and four Battershell challenges the legal and factual sufficiency of the
evidence to support termination of her parental rights under section
161.001(1)(D).  Having found sufficient evidence to support the trial court’s
finding under subsection (E), it is unnecessary to address these issues.

Best Interests

In her final two issues, Battershell challenges the
legal and factual sufficiency of the evidence to support the trial court’s
finding termination of her parental rights is in the best interest of I.L.L.
and D.R.M.S.  There is a strong presumption that the best interest of the child
is served by keeping the child with its natural parent and the burden is on the
petitioner to rebut that presumption.  In re U.P., 105 S.W.3d at 230. 

In deciding whether termination is in the best
interest of I.L.L. and D.R.M.S., we examine several factors for each child,
including (1) the desires of the child, (2) the present and future physical and
emotional needs of the child, (3) the present and future emotional and physical
danger to the child, (4) the parental abilities of the persons seeking custody,
(5) the programs available to assist those persons seeking custody in promoting
the best interest of the child, (6) the plans for the child by the individuals
or agency seeking custody, (7) the stability of the home or proposed placement,
(8) acts or omissions of the parent which may indicate the existing
parent-child relationship is not appropriate, and (9) any excuse for the
parent's acts or omissions.  Holley v. Adams, 544 S.W.2d 367, 372 (Tex.
1976).  This list is not exhaustive, nor is evidence required on all nine
factors to support terminating a parent’s rights.  Id.  The same
evidence of acts or omissions that support termination under section 161.001(1)
may be probative in determining a child’s best interest.  In re A.A.A.,
265 S.W.3d 507, 516 (Tex. App. – Houston [1st Dist.] 2008, pet. denied).  

Testimony established that the children want to live
with their mother.  The first factor therefore weighs against the trial court’s
finding.

However, Battershell is not able to provide for the
present and future physical and emotional needs of her children and she
continues to pose a present and future emotional and physical danger to the
children.  Since the children were first returned to her, Battershell has not
provided a stable home and has not had stable employment.  After Battershell’s
children were returned to her care, she has been convicted of prostitution
twice, both times resulting in imprisonment, and left the children in a hotel
room.  Battershell has continued her relationship with Smith in spite of his
abusive behavior and continued drug use.  Thus, the second and third factors
weigh in favor the trial court’s finding.

Regarding Battershell’s parenting abilities, the
testimony of Dakendria Wheeler and Tracey Joseph provides evidence that
Battershell was a good parent.  Their testimony, however, concerned the time
period before the children were first removed.  The evidence regarding
Battershell’s parenting skills since the children were returned to her
establishes that the fourth factor weighs in favor of the trial court’s
finding.  

According to Rhonda Washington, Battershell has not
complied with her current plan of service.  Therefore the fifth factor also
weighs in favor of the trial court’s finding. 

The children’s foster parents are interested in
adopting them and can provide a suitable and permanent home.  Battershell has
no dwelling for the children.  Although she testified that she planned to move
to her mother’s home in Louisiana, she did not indicate that her mother, who
has a live-in boyfriend, has been advised of or agreed to Battershell’s plan. 
The sixth and seventh factors weigh in favor of the trial court’s finding.

The acts and omissions discussed in this opinion that
support the trial court’s finding of endangerment also indicate the existing
parent-child relationship is not appropriate.  The eighth factor weighs in
favor of the trial court’s finding.

Finally, we consider any excuses for Battershell’s
conduct.  The only excuse Battershell offered for her conduct concerned her
second conviction for prostitution and the accompanying charge of child
abandonment.  She offered no excuse for committing another act of prostitution
immediately after her release.  The last factor also weighs in favor of the
trial court’s finding. 

After reviewing this evidence, we conclude the trial
court's determination that terminating appellant's parental rights is in the
best interest of I.L.L. and D.R.M.S is supported by legally and factually
sufficient evidence.  We overrule appellant’s fifth and sixth issues.

CONCLUSION

Having overruled all of appellant's issues, we affirm
the trial court's judgment.

                                                                                    

                                                                        /s/        Kent
C. Sullivan

                                                                                    Justice

 

Panel consists of Justices Frost, Boyce, and Sullivan.









[1] The trial court's order
also terminated the parental rights of Robert Smith and an unknown father, but
neither of them has appealed.

 

 





[2] I.L.L.’s father is the
unknown father whose parental rights were also terminated.





[3] Smith was ordered to
submit to genetic testing but the record does not indicate paternity of
D.R.M.S. was established.